FORT DEARBORN COAL CO. v. NEWAYGO PORTLAND
CEMENT CO.

1. SALES—WHETHER DELAY IN SHIPMENTS WAS BEYOND CONTROL
OF SELLER A JURY QUESTION.

Whether delay in shipments of coal was occasioned by
causes beyond the control of the seller, under the pro-
visions of the sales contract, held, under the evidence, a
question for the jury.[1]

2. SAME—BREACH OF CONTRACT—GREAT WEIGHT OF EVIDENCE.

In an action by the seller of coal for damages for breach
of contract, a verdict for the buyer on its claim for re-
coupment of damages caused by the seller's failure to ship
according to contract, held, not against the weight of the
evidence.[2]

3. SAME—BREACH OF CONTRACT—WAIVER.

Where the seller of coal refused to make shipments under
the sales contract, but offered to ship at advanced prices,
and the buyer, after repeated requests to ship under the
contract, and after notifying the seller that it would be
held responsible for damages for breach thereof, accepted
shipments at advanced prices, it cannot be said, as a
matter of law, that the buyer waived performance of the
contract.[3]

4. SAME—FORFEITURE OF CONTRACT FOR BREACH—WAIVER.

The rule that, where the parties have waived perform-
ance of their contracts, particularly as to time of perform-
ance, neither party may forfeit the contract without giv-
ing notice thereof and a reasonable time for performance,
may not be invoked by the seller of coal where the buyer
did not waive its right to performance.[4]

5. SAME—PARTY IN DEFAULT BY REFUSING CANCELLATION PRE-
SERVED ITS LIABILITY UNDER CONTRACT.

Where the seller of coal, after defaulting in shipments,
refused to acquiesce in the buyer's request to cancel the

---

[1]Sales, 35 Cyc. p. 600; [2]Id., 35 Cyc. p. 591 (1926 Anno); [3]Id.,
35 Cyc. p. 187; [4]Id., 35 Cyc. p. 185.

On right of seller to rescind or refuse further deliveries upon
the buyer's failure to pay for instalments, see note in 14 A.
L. R. 1209.

contract, it preserved its liabilities as well as its rights thereunder.[5]

6. SAME—ACCEPTANCE OF DEFAULT SHIPMENTS NOT A WAIVER OF SUBSEQUENT BREACHES.

Acceptance by the buyer of coal of shipments which were in default under the contract and payment therefor under protest did not constitute a waiver by the buyer of the seller's further breaches in failing to make other shipments thereunder.[6]

7. SAME—ACCEPTANCE TO AVOID IRREPARABLE LOSS NOT A WAIVER OF SUBSEQUENT BREACHES.

Where, under a contract for the sale of coal, payment was of the essence, and without coal the buyer would suffer irreparable loss, it was required to accept shipments, although in default, in order to minimize its damages, and therefore, by its acceptance and payment for said shipments it did not waive its right to the delivery of the balance or estop it from asserting its right to damages for subsequent breaches on the seller's part.[7]

8. SAME — DAMAGES — CONSTRUCTION OF CONTRACT — EXCESSIVE VERDICT.

Where a contract for the sale of coal gave the quantity as 20,000 to 25,000 tons, the seller was not bound to deliver in excess of 20,000 tons, the option, if one existed, being with it, and a verdict and judgment for the buyer based on its right to have 25,000 tons is therefore excessive, and, on appeal, is affirmed on condition that the excess be remitted.[8]

Error to Newaygo; Barton (Joseph), J. Submitted January 23, 1925. (Docket No. 114.) Decided April 3, 1925. Rehearing denied June 18, 1925.

Assumpsit by the Fort Dearborn Coal Company against the Newaygo Portland Cement Company for breach of a contract for the purchase of coal. Judgment for defendant. Plaintiff brings error. Affirmed, conditionally.

[5]Sales, 35 Cyc. p. 129; [6]Id., 35 Cyc. pp. 185, 186; [7]Id., 35 Cyc. p. 186; [8]Id., 35 Cyc. pp. 209, 639.

*Cross, Foote & Sessions* (*Walter K. Sibbald*, of counsel), for appellant.

*William J. Branstrom* (*William K. Clute*, of counsel), for appellee.

FELLOWS, J.    While dated April 16, 1920, it appears that the following contract was executed May 4th by the parties to this case:

"FORT DEARBORN COAL COMPANY,
343 South Dearborn Street,
Chicago, Ill.
"Chicago, April 16, 1920.

"The Fort Dearborn Coal Company hereby agrees to sell, and Newaygo Portland Cement Co., Newaygo, Michigan, agrees to buy the following coal at the prices and upon the terms herein below set forth:

"Quantity—20,000 to 25,000 tons.

"Grade—Perry County Illinois No. 5.

"Size—Screenings—coal that passes through ⅜ inch screen.

"To be shipped—To Newaygo Portland Cement Co.

"Route—Pere Marquette R. R. Newaygo, Michigan.

"Shipments—Equal weekly.

"Price—$2.60 f. o. b. mines per net ton.

"In effect from—May 1st, 1920, to April 1st, 1921.

"Equipment—Available.

"Remarks:

"Terms of Payment: Cash on or before the 15th of each month for all coal or coke shipped during the preceding month.    Bills subject to sight draft if not paid when due.    Terms of payment being essence of this contract, noncompliance therewith shall give sellers privilege of cancellation and waiver in any case shall not be construed as destroying this right: And also, the right to cancel this contract is especially reserved in the event the seller has reason to believe that the credit of the buyer is impaired.

"Actual railroad weights at scales nearest point of shipment shall govern settlements.

"Price made subject to change in freight, switching, spotting and cost of production.

"This contract is made subject to strikes, combination of miners or laborers, lockouts, accidents, car

supply, delay in transportation and other causes beyond control.

"In the event of preparation of, or actual participation in war by this government, this contract is made subject to any action taken by the government such as commandeering coal due on this particular contract.

"The buyer and seller in entering into this contract realize the uncertainty of deliveries, due to strikes, casualties and other causes beyond the control of either party; and it is expressly agreed that the intent of this contract is not to make either party liable for any failure to perform due to matters beyond the control of the party in default, but that the material shall be shipped by the seller and accepted by the buyer pursuant to the terms hereof, so far as physical conditions and labor conditions at the respective plants and the services rendered by common carriers will permit.

"It is also understood and agreed that if there should be a shortage of cars, shipments will be divided from time to time in fair proportions on all contracts and orders accepted on or prior to date of this contract.

"And it is further agreed and understood that in the event the buyer fails to comply with the terms and conditions of payment, or neglects to order, or refuses to receive coal as specified herein, the seller may cancel this agreement and shall not therefor be liable for any claims of damages of any nature whatsoever.

"Signed in duplicate.

"Accepted:

"NEWAYGO PORTLAND CEMENT CO.,

J. B. JOHN, Manager.

"Accepted:
  "FORT DEARBORN COAL CO.,
    By G. F. STAHMER, President."

Plaintiff is not an operator; its officers and agents style it a "sales agency." No coal was shipped on this contract until about the middle of July, and but 3,492.25 tons had been shipped by the forepart of November. Soon after the execution of this contract, the price of coal advanced by leaps and bounds, and

defendant was obliged to go into the market and buy coal at the advanced price to keep its plant running. The coal so purchased is referred to by the witnesses as "substitute coal" and the coal shipped under the contract as "contract coal." We shall use these terms during the course of this opinion. Much of the substitute coal was bought from plaintiff and paid for when delivered. Defendant's testimony tends to show that at times it could not get enough coal to keep its plant running and that it bought coal wherever it could be had, and that by the 1st of November it had a supply on hand to last it through its season and its bins were full. On November 2d, it wrote plaintiff the following letter:

"NEWAYGO PORTLAND CEMENT COMPANY,
Newaygo, Mich.,
"Nov. 2, 1920.
"FORT DEARBORN COAL CO.,
"Chicago, Ill.
"*Gentlemen:* Please stop all shipments of coal to us at Newaygo.
"We have on hand, almost enough coal to run us the balance of this season and on account of your coal being so awful fine, we find it impossible to use it in the wet and cold weather, and we would ask you to please cancel the balance of our contract for screenings.
"Yours truly,
"NEWAYGO PORTLAND CEMENT CO.,
J. B. JOHN,
Vice-President & Gen. Mgr."

Defendant claims the first sentence of this letter referred to substitute coal. Plaintiff declined the request to cancel the contract. Coal was then back to about normal prices. Plaintiff subsequently shipped two cars of contract coal which were refused. Plaintiff brings this suit to recover a small balance due for substitute coal and for the loss it claims to have suffered by defendant's refusal to take the balance of the contract coal and asked for a directed verdict for

$13,047.43. Defendant concedes the small balance for substitute coal, and claims the right to recoup its damages occasioned by the failure of plaintiff to ship coal in accordance with the contract. The trial court declined to direct a verdict for plaintiff and submitted the case to the jury. A verdict for defendant in the sum of $30,459.93 resulted. There were motions for judgment notwithstanding the verdict and for a new trial; both of which were refused.

1. It is the claim of plaintiff that the delays in shipment were occasioned by causes beyond its control and, therefore, under the provisions of the contract above quoted, it was not liable therefor, and it asked the court to hold that the undisputed evidence established such claim and to direct a verdict for the amount above noted. The defendant, on the other hand, claimed that the excuses advanced were but pretexts and that the testimony made a case for the jury on this question. Plaintiff's claim is that the initial delay from May 1st to the middle of July was occasioned by delays in installing a re-screening machine at the mine. It produced no witness from the mine or who had been at the mine or who knew the facts first hand to sustain such claim. Witnesses were permitted to testify without objections to information received from the operators of the mine on the subject. One of defendant's witnesses, an engineer of experience, testified that a re-screening machine should be installed in two weeks' time. Plaintiff claimed there were numerous embargoes which delayed shipments; defendant's witnesses denied there were any which lasted beyond a few days, and plaintiff produced no railroad men to sustain its claim. Plaintiff also claims that a switchmen's strike at Chicago tied up shipments through that gateway, but defendant introduced bills of lading showing that at least some of the shipments came through Porter, Indiana, and not through

the Chicago yards at all.    Plaintiff claims there was a strike at the mine but offered no first-hand testimony to sustain such claim.    It claims there were car shortages but defendant's testimony shows they were able to get cars of substitute coal from plaintiff and others whenever they were willing to pay the advanced price. And while plaintiff claimed that embargoes and strikes and car shortages and labor troubles prevented it from shipping defendant about 40 cars a month, its sales agent testified that during this period it was shipping from 1,500 to 1,800 cars a month, all of which was doubtless being sold at the excessively high prices which temporarily prevailed.    The testimony took this question to the jury, and the verdict was not against its weight.

2. The trial judge was asked to hold as matter of law that plaintiff's defaults in shipments under the contract had been waived by defendant and to direct a verdict on that ground.    We shall presently consider the claim of plaintiff's counsel that the acceptance of and payment for the coal shipped waived plaintiff's defaults in shipments and for the present consider the question of whether the record makes such a case as that the trial judge would have been justified in holding as matter of law that defendant had waived performance of the contract by plaintiff.    Plaintiff's repeated and persistent breaches of the contract are beyond question.    The record contains many letters and telegrams from defendant, in the main couched in courteous language, requesting plaintiff to ship the coal it had contracted to ship, and defendant's vice-president and general manager testified:

"I told the president of the company that we would hold them responsible and there would be a day of reckoning and they would have to pay the difference between the contract price and what we were paying for coal on the open market.

"This conversation was with the president of the

company, Mr. Stahmer, and occurred early in June when they failed to make shipments.   *   *   *

"Whenever they rendered us a statement for coal that was shipped we paid that statement.   We had a talk with them about that.   It was either the latter part of August or the early part of September that they called us on the telephone in regard to payments and at that time I told the gentleman who talked to me we would pay for the coal, but it wasn't worth the money, but later on there would be an accounting.

"*Q.* What did he say?

"*A.* He laughed at me.   So we took the coal and paid for it with that understanding."

In *Dow Chemical Co.* v. *Chemical Works,* 208 Mich. 157 (14 A. L. R. 1200), this court said:

"Waiver implies the abandonment of a right by a person entitled to exercise it, who has at the time full knowledge of the existence of the fact on which the right depends.   Such knowledge and the intention to relinquish the right must concur.   The facts relied on must also show that such intent was communicated to and so understood by the party claiming the waiver.   It is, in effect, the abandonment of a particular obligation and an agreement to substitute another in its stead."

Ruling Case Law in its article on Waiver has this to say:

"According to the generally accepted definition a waiver is the intentional relinquishment of a known right.   It is a voluntary act, and implies an election by the party to dispense with something of value, or to forego some advantage which he might at his option have demanded and insisted on."   27 R. C. L. p. 904.

"Whether there has been a waiver is generally a question of fact, and the sufficiency of the evidence relating thereto is for the jury."   27 R. C. L. p. 912.

The trial judge did not err in declining to hold as matter of law that defendant had waived performance of the contract by the plaintiff according to its terms.

3. Counsel for plaintiff also invoke that line of cases in this and other courts which hold that where the parties have waived performance of their contracts, particularly as to time of performance, neither party may forfeit the contract without giving notice thereof and a reasonable time for performance. But that line of cases is bottomed on the theory that there has been a waiver of the terms of performance which has lulled the other party to the belief that strict performance will not be insisted upon. The holdings referred to being bottomed on waiver, what we have already said on that subject demonstrates that in the instant case the trial judge would not have been justified in disposing of the question as matter of law as he was requested to do.

4. Plaintiff also insists that it was entitled to a directed verdict on the authority of the recent case of *Walter-Wallingford Coal Co.* v. *A. Himes Coal Co.,* 223 Mich. 576. But that case differs materially from the one before us. In that case, as here, there had been delays. In that case, differing from this one, the vendee gave a notice fixing the time for performance of the contract "or cancel same." The vendor acquiesced in the request to cancel and treated the contract as at an end. In that case the parties by their mutual action put an end to the contract without any reservation on the part of either of the right to claim damages. Here, as explained by the proof, defendant directed plaintiff to stop shipments of substitute coal and requested a cancellation of the order for "screenings." In this request to cancel the plaintiff did not acquiesce but positively refused and insisted upon its rights under the contract. It expressly declined to put an end to the contract, and expressly insisted that it be kept alive; it could be mutually put at an end only by the acquiescence of both parties. Plaintiff declined to give its ac-

quiescence.   The contract was kept alive by it for the supposed benefit which might accrue to it.   If kept alive for the benefit of plaintiff, it was likewise kept alive for the benefit of defendant.   In the instant case defendant's letter was a request, in courteous language, to cancel the contract; it was not a notice of rescission; and being but a request it is unimportant whether it gave a good or a bad reason.   It was up to plaintiff to accede to the request and put an end to the contract or to decline and leave it in force.   It chose the latter course.   By so choosing it preserved its rights under the contract, and likewise its liabilities thereunder.

5. After the court had concluded his charge to the jury, plaintiff's counsel orally asked the court to instruct the jury as follows:

"I will ask the court to instruct the jury that if they find the defendant company accepted shipments of coal under the contract after delays, and with the knowledge of those breaches, if they were breaches on the part of the plaintiff, accepted the coal and paid for it in full, the defendant thereby waives any claim of a breach—waived any breach of the contract by the plaintiff, and cannot assert any claim for damages based upon an alleged breach by the plaintiff."

This was in effect a request for a directed verdict as the testimony was undisputed that the defendant paid for the contract coal as it was shipped.   The trial judge declined to give it.   We have already quoted sufficient of the testimony on behalf of defendant to show that it paid for the coal under protest and that it insisted that there would be a day of reckoning, when it would insist upon its damages.   There is a line of cases not necessary to cite which hold that where the goods are shipped with an opportunity to inspect and are used and paid for, the purchaser may not thereafter claim that they are not up to the war-

230—Mich.—24.

ranty or do not comply with the contract.    The trial judge recognized this line of cases and declined to permit testimony tending to show that the contract coal actually shipped was of a poor quality and unsuitable for defendant's use.    By this request plaintiff requested the court to go further and hold that acceptance by and payment for partial shipments waived plaintiff's breaches in failing to make other shipments. This question is foreclosed by *Pittsburgh & Ohio Mining Co.* v. *Scully*, 145 Mich. 229, where it was held (quoting from the syllabus) :

"Acceptance of coal not promptly shipped does not waive the claim that other coal bought at the same time was not promptly delivered as provided by the contract."

While some courts have held to the contrary, we are persuaded that this case is in consonance with the weight of authority.    See *Smith* v. *Droubay*, 20 Utah, 443 (58 Pac. 1112) ; *Sun Manufacturing Co.* v. *Egbert & Guthrie*, 37 Tex. Civ. App. 512 (84 S. W. 667) ; *Canton Lumber Co.* v. *Liller*, 107 Md. 146 (68 Atl. 500) ; *Hansen* v. *Kirtley*, 11 Iowa, 565; *Waterman* v. *Clark*, 76 Ill. 428; *Cofield* v. *Clark*, 2 Colo. 101; *Ruff* v. *Rinaldo*, 55 N. Y. 664; 13 C. J. p. 672; *In re Kelly*, 51 Fed. 194; *Wall* v. *Cold Storage Co.*, 112 Mo. App. 659 (87 S. W. 574).

There is also another line of cases in which the vendee by reason of the emergency of the occasion is required to take what is offered even though not complying with the contract to avoid irreparable injury or to minimize his loss.    Illustrative of this line of cases is *Industrial Works* v. *Mitchell*, 114 Mich. 29. In addition to the cases there cited, see *Griffith* v. *Newell*, 69 S. C. 300 (48 S. E. 259) ; *Chattanooga Car & Foundry Co.* v. *LeFebvre*, 113 La. 487 (37 South. 38), on rehearing.    In the contract here involved payment was of the essence; failure to pay promptly

authorized plaintiff to cancel the contract.   Defendant was a large manufacturer of cement and without coal would be obliged to shut down its plant and suffer irreparable loss.   Payment for the small amount of coal delivered did not waive its right to the delivery of the balance nor estop it from asserting its right to damages occasioned by the almost continuous breaches of the contract on plaintiff's part.

6. Errors are assigned on certain portions of the charge but they do not merit discussion.   The charge was a fair one and protected plaintiff's rights.   Doubtless the trial judge would have elaborated further as to plaintiff's claims had plaintiff preferred appropriate requests.   It, however, saw fit to rest its case on its requests for a directed verdict.   A case was made for the jury and it was properly submitted to them.

7. We now take up the objections to the admission of the testimony of defendant's accountant, Mr. Dawson.   His testimony had solely to do with the question of the amount of defendant's damages and in no way affected the main questions in the case.   He was permitted to testify to calculations made by him on the theory that plaintiff was required to furnish 25,000 tons of coal under the contract.   If plaintiff was obligated by the contract to furnish this amount of coal, the verdict and judgment are for the correct amount.   If the plaintiff was only obligated to furnish 20,000 tons, the judgment is too large and we should reverse the case unless the defendant remits the excess.   *McDonald* v. *Smith*, 139 Mich. 211.   We think the plaintiff was not bound to deliver in excess of 20,000 tons; the option, if one existed, was with it. *Wheeler* v. *Railroad Co.*, 115 U. S. 29 (5 Sup. Ct. 1061, 1160) ; *Illinois Glass Co.* v. *Three States Lumber Co.*, 90 Ill. App. 599.   Defendant's damages were based on plaintiff's failure to deliver 8,883.95 tons of coal during the period involved; they should have been

based on plaintiff's failure to deliver 7,472.19 tons. A mathematical calculation, therefore, shows that the verdict and judgment should have been $25,457.95 instead of the amount it was.

If defendant within 30 days from the filing of this opinion shall remit the judgment to this figure, it will stand affirmed in this amount; otherwise, the case will be reversed and a new trial granted.    In either event, plaintiff will recover costs of this court.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, STEERE, and WIEST, JJ., concurred.